## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEREMY PINSON,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:18-cv-118** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **UNITED STATES OF AMERICA,** | : | |
| **Defendant** | : | |

## MEMORANDUM

## I.      BACKGROUND

On January 16, 2018, Plaintiff Jeremy Pinson ("Plaintiff"),[1] an inmate currently incarcerated at the Federal Correctional Institution in Tucson, Arizona ("FCI Tucson"), filed a *pro se* complaint pursuant to the Federal Tort Claims Act ("FTCA"), alleging that while incarcerated at USP Allenwood, and while suicidal, she displayed a razor to a correctional officer, who failed to retrieve the razor pursuant to applicable Bureau of Prisons ("BOP") policy.  (Doc. No. 1.)  Plaintiff alleges that she then attempted to remove her testicles and scrotum, resulting in surgery to repair the self-inflicted injuries.  (*Id.*)  She further maintains that a nurse "used a pair of unclean pli[e]rs to reach into the open wound on her scrotum and forcibly removed a spring resulting in

---

[1] The Court notes that in a previous action, Plaintiff has provided that she is a male-to-female transgender individual.  *See Pinson v. United States*, No. 17-cv-584 (M.D. Pa. 2017).  A court may take judicial notice of its own records in other cases.  *See* Fed. R. Evid. 201; *Ernest v. Child & Youth Servs. of Chester Cty.*, 108 F.3d 486, 498-99 (3d Cir. 1997).

severe pain, injury to the scrotum and the loss of a chunk of flesh." (*Id.*) Plaintiff seeks $1 million in damages as relief. (*Id.*)

By Memorandum and Order entered on August 8, 2018, the Court granted Plaintiff leave to proceed *in forma pauperis* and dismissed her complaint as duplicative and barred by *res judicata*. (Doc. Nos. 12, 13.) The Court concluded that Plaintiff was raising the same claim she had previously raised in *Pinson v. United States*, No. 17-cv-584 (M.D. Pa. 2017). Plaintiff subsequently filed a motion for reconsideration (Doc. No. 14), arguing that while the incidents were similar, they occurred on two separate dates. By Memorandum and Order entered on November 28, 2018, the Court granted Plaintiff's motion for reconsideration and directed service of the complaint upon the United States. (Doc. Nos. 15, 16.)

This matter is before the Court pursuant to the motion for summary judgment filed by the United States of America on April 22, 2019. (Doc. No. 22.) After receiving an extension of time to do so (Doc. Nos. 24, 27), the Government filed its supporting materials on May 13, 2019 (Doc. Nos. 28, 29). After receiving an extension of time (Doc. Nos. 30, 31), Plaintiff filed her brief in opposition and counterstatement of material facts on July 22, 2019. (Doc. Nos. 32, 33.) The Government filed a reply on August 5, 2019. (Doc. No. 34.) That same day, observing that the Government raised the issue of whether Plaintiff had exhausted her administrative remedies with respect

to her claim regarding the nurse in accordance with the Prison Litigation Reform Act ("PLRA"), the Court issued a *Paladino* Order informing the parties that it would consider the exhaustion issue in the context of summary judgment and, by doing so, would consider matters outside the pleadings in its role as factfinder.[2] (Doc. No. 35.) The Court provided the United States of America fourteen (14) days to file an amended or supplemental brief "to further address the issue of whether Plaintiff has exhausted his administrative remedies." (*Id.*) The Court further noted that Plaintiff should file a brief in opposition addressing the issue of administrative exhaustion, as well as a statement of material facts specifically responding to the Government's statement, within twenty-one (21) days from the date that the Government filed any amended or supplemental materials. (*Id.*)

On August 8, 2019, the United States of America filed a letter regarding the Court's August 5, 2019 Order. (Doc. No. 36.) In this letter, the Government states that it has "reviewed the brief in support of [its] motion for summary judgment and the statement of material facts previously filed." (*Id.*) It "believes it has fully stated and supported its position on the exhaustion issue in those documents." (*Id.*) Accordingly, "the United States will not avail itself of the opportunity to file a supplemental memorandum and statement of material facts but will instead rely on the papers

---

[2] *See Paladino v. Newsome*, 885 F.3d 203 (3d Cir. 2018).

previously filed." (*Id.*)  In light of the Government's letter and decision to not file supplemental materials, there will be no supplemental materials to which Plaintiff can respond.  Accordingly, the motion for summary judgment is ripe for resolution.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party.

*Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White*, 826 F.2d at 59. In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.* (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. *See Sanders v. Beard*, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); *Thomas v. Norris*, No. 02-CV-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

## III.  STATEMENT OF MATERIAL FACTS[3]

Plaintiff was incarcerated at USP Allenwood from March 10, 2016 through July 18, 2016.  (Doc. No. 28 ¶ 1.)  Upon arrival, she underwent a screening by the psychology department.  (*Id.* ¶ 4.)  The psychologist noted that Plaintiff "has an extensive history of mental illness dating back to the age of 10."  (*Id.* ¶ 5.)  The psychologist also indicated that "during periods of anger, [Plaintiff] had been identified as someone who hurts others (people and animals) with objects including knives."  (*Id.* ¶ 6.)  The screening indicated that Plaintiff had been diagnosed with gender dysphoria in June of 2015 and that her psychological treatment had included "therapy sessions focused on depressive issues related to gender dysphoria as well

---

[3] This Court's Local Rules provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried."  M.D. Pa. L.R. 56. 1.  The Rule further requires the inclusion of references to the parts of the record that support the statements.  *Id.* Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.  *See id.*

Here, Plaintiff filed a response to the Government's statement of material facts in compliance with Local Rule 56.1.  (Doc. No. 32.)  Moreover, while Plaintiff's verified complaint may be treated as an affidavit in opposition to the motion for summary judgment, *see Ziegler v. Eby*, 77 F. App'x 117, 120 (3d Cir. 2003), the allegations must be based on personal knowledge, and this Court is not "required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question."  *See Hammonds v. Collins*, Civ. No. 12-236, 2016 WL 1621986, at *3 (M.D. Pa. Apr. 20, 2016) (citing *Brooks v. Am. Broad. Co.*, 999 F.2d 167, 172 (6th Cir. 1993)). Accordingly, the Court sets forth the undisputed facts above with footnotes setting forth the parties' relevant factual disputes.

as improving DBT (dialectical behavior therapy)[4] skills." (*Id.* ¶¶ 7-8.) The psychologist conducting the screening further noted that throughout her incarceration, Plaintiff "regularly received individual counseling but continued to engage in self-harm (cutting wrists, swallowing pills, cutting testicles)."[5] (*Id.* ¶ 9.) The psychologist was concerned that Plaintiff would engage in self-harm "due to poor distress tolerance and perceived lack of control," and noted two (2) prior occasions where Plaintiff "engaged in genitalia mutilation for being distressed over having a penis rather than a vagina." (*Id.* ¶¶ 11-12.)

The psychologist recommended that Plaintiff could be placed into general population, but Plaintiff was placed in the Special Housing Unit ("SHU") until cleared by custody. (*Id.* ¶¶ 2, 13-14.) It was recommended that Plaintiff "have a cellmate as a protective factor, especially while housed in the SHU." (*Id.* ¶ 14.) Plaintiff was classified as a care level 3 mental health inmate, and the psychologist decided it was appropriate to see Plaintiff weekly in private sessions. (*Id.* ¶¶ 15-16.)

---

[4] DBT "is behavior therapy used to identify obstacles to changing emotions; reduce vulnerability to emotional mind; increase positive emotional events; increase mindfulness to current emotions; apply distress tolerance techniques." (Doc. No. 28 ¶ 8 n.1.)

[5] The Government maintains that Plaintiff "denied suicidal ideation and any thoughts of self-harm or significant distressing emotions." (*Id.* at ¶ 10.) Plaintiff, however, asserts that she "reported suicidal thoughts, feelings, and intent every single day she was in [the Special Housing Unit]." (Doc. No. 32 at 1.)

The psychologist, however, saw Plaintiff "more frequently than once a week." (*Id.* ¶ 17.)

During his incarceration at USP Allenwood, psychologist A. Handel treated Plaintiff approximately 31 times. (*Id.* ¶ 18.) Plaintiff also saw other psychologists during this period. (*Id.* ¶ 19.) Plaintiff "would often claim suicidal thoughts in order to be seen by the psychologist."[6] (*Id.* ¶ 20.) On March 11, 2016, Plaintiff asked to speak with psychology, and the discussion "included a belief that [Plaintiff] did better having a cellmate (which was provided upon placement in SHU)." (*Id.* ¶ 23.) Plaintiff "spoke positively and the thought process was noted as logical, coherent, and goal oriented."[7] (*Id.* ¶ 24.)

On March 15, 2016, Plaintiff "discussed safety concerns for entering general population and a desire to remain in protective custody" in the SHU. (*Id.* ¶ 26.) She wanted a transfer to another facility and personal property items, such as female undergarments. (*Id.* ¶ 27.) The psychologist discussed coping skills with Plaintiff

---

[6] The Government maintains that despite claims of suicidal thoughts, Plaintiff "then would focus on things such as personal property or hygiene items." (Doc. No. 28 ¶ 20.) Because of this, the psychologist concluded "there were no genuine suicidal thoughts or intent to self-harm but rather attempts to manipulate staff in order to obtain things [Plaintiff] wanted." (*Id.* ¶ 21.) Plaintiff, however, asserts that she "never requested or complained about anything in relation to her expression of suicidal ideation or self-harm." (Doc. No. 32 at 2.)

[7] The Government maintains that during this session, Plaintiff "denied suicidal/homicidal or self-injurious behavior ideation, intention or plan." (Doc. No. 28 ¶ 25.) Plaintiff, however, maintains that she "reported suicidal thoughts, feelings, and intent every single day she was in SHU." (Doc. No. 32 at 1.)

and noted that she "had a more positive outlook since first arriving at USP Allenwood." (*Id.* ¶ 28.) The psychologist also noted that Plaintiff's legal work served as another positive outlet "to stay focused in the SHU."[8] (*Id.* ¶ 29.)

On March 22, 2016, Plaintiff reported to the psychologist "feelings of relief and satisfaction with the current cellmate." (*Id.* ¶ 32.) She was scheduled for a tele-psychiatry consult later that week so she could discuss a psychiatric medication regimen. (*Id.* ¶ 34.) She again asked about "appropriate undergarments."[9] (*Id.* ¶ 35.) On April 5, 2016, Plaintiff told psychology that she had been experiencing mood swings since "switching to new estrogen medication" and that she was unable to deal with the mood swings.[10] (*Id.* ¶ 37.) On April 11, 2016, the psychologist

---

[8] The Government maintains that during this session, Plaintiff "denied suicidal/homicidal or self-injurious behavior ideation, intention or plan." (Doc. No. 28 ¶ 30.) Plaintiff, however, maintains that she "reported suicidal thoughts, feelings, and intent every single day she was in SHU." (Doc. No. 32 at 1.)

      The Government also maintains that three (3) days later, on March 18, 2019, Plaintiff "reported no mental health concerns to psychology and SHU staff reported no observed mental health problems or issues with the inmate." (Doc. No. 28 ¶ 31.) Plaintiff asserts otherwise. (Doc. No. 32 at 1.)

[9] The Government maintains that during this session, Plaintiff "indicated how having a positive cellmate helps avoid self-injurious behavior" and that she "denied suicidal/homicidal or self-injurious behavior ideation, intention or plan." (Doc. No. 28 ¶¶ 33, 36.) Plaintiff, however, maintains that she "reported suicidal thoughts, feelings, and intent every single day she was in SHU." (Doc. No. 32 at 1.)

[10] The Government maintains that during this session, Plaintiff "denied suicidal/homicidal or self-injurious behavior ideation, intention or plan." (Doc. No. 28 ¶ 38.) Plaintiff, however, maintains that she "reported suicidal thoughts, feelings, and intent every single day she was in SHU." (Doc. No. 32 at 1.)

noted that Plaintiff "met the criteria to be considered a care level 3 mental health inmate requiring enhanced outpatient mental health care and would be seen weekly." (*Id.*

¶ 39.) The psychologist also noted that Plaintiff "threatens to sue staff and engage in self harming behaviors when frustrated" and that she has a long history of "inappropriate, intense anger or difficulty controlling anger and is prescribed anti-psychotic medication."[11] (*Id.* ¶¶ 40-41.)

On April 21, 2016, it was noted that Plaintiff had recently been released from the administrative detention section of the SHU to the compound, and that she was "adjusting to living in an open space versus being locked down, going to the yard to exercise, cooking food and socializing in the unit." (*Id.* ¶¶ 45-46.) Plaintiff reviewed coping skills and "denied suicidal/homicidal or self-injurious behavior ideation, intention or plan." (*Id.* ¶ 48.)

On April 25, 2016, the psychologist noted that Plaintiff "was continuing to adjust to the compound and was looking for a job." (*Id.* ¶ 49.) They discussed

---

[11] Upon review of notes, the psychologist commented that Plaintiff "is an inmate who would attempt to manipulate staff by threatening suicide or self-harm in order to achieve secondary gain such as 'appropriate undergarments.'" (Doc. No. 28 ¶ 42.) Thus, "efforts were made to not only keep [Plaintiff] safe from self-harm and harm by others, but also trying to treat the inmate's medical and mental conditions." (*Id.* ¶ 43.) Plaintiff disputes these statements, noting that she "reported suicidal thoughts, feelings, and intent every single day she was in SHU." (Doc. No. 32 at 1.)

medications and the importance of Plaintiff taking them as prescribed. (*Id.* ¶ 50.) Plaintiff was "happy with a mentor assignment and was talking with him every day." (*Id.* ¶ 51.) The psychologist and Plaintiff discussed coping skills, and Plaintiff "denied suicidal/homicidal or self-injurious behavior ideation, intention or plan." (*Id.* ¶ 52.)

On May 2, 2016, Plaintiff reported that her adjustment to the compound was "going great," she had a job in the kitchen washing pots and pans, and that she "was continuing to do legal work to stay busy and focused." (*Id.* ¶¶ 53-54.) Plaintiff denied "suicidal/homicidal or self-injurious behavior ideation, intention or plan." (*Id.* ¶ 55.) This report "was viewed as very positive given the lengthy period of time [Plaintiff] was in lockdown status prior to arriving at USP Allenwood." (*Id.* ¶ 56.) Plaintiff was "transitioning well to general population." (*Id.* ¶ 57.)

On May 9, 2016, Plaintiff reported having a good week, that she enjoyed working in the kitchen, and that she liked general population at USP Allenwood. (*Id.* ¶ 58.) She and the psychologist discussed available programs at USP Allenwood and USP Terre Haute. (*Id.* ¶ 59.) Plaintiff "denied suicidal/homicidal or self-injurious behavior ideation, intention or plan." (*Id.* ¶ 60.)

Later that day, the Chief Psychologist was notified by a Special Investigative Agent ("SIA") that Plaintiff had reported allegations related to the Prison Rape

Elimination Act ("PREA").  (*Id.* ¶ 61.)  Plaintiff told the Chief Psychologist that another inmate "threatened to 'pimp' out [Plaintiff] and [her] cellmate."  (*Id.* ¶ 62.) Plaintiff declined services from a victim advocate.  (*Id.* ¶ 63.)  A lieutenant determined "it was appropriate for [Plaintiff] to be housed in the SHU temporarily" while an investigation occurred.  (*Id.* ¶ 64.)

On May 13, 2016, a psychologist performed a Suicide Risk Assessment of Plaintiff.  (*Id.* ¶ 65.)  Plaintiff's "history was recounted and current problems were listed as 'extreme inward emotional pain and frustration.'"  (*Id.* ¶ 66.)  Plaintiff expressed frustration and irritation at being in the SHU again, stated that she "hated being 'placed in a box,'" and that she was experiencing urges to cut herself.  (*Id.* ¶ 67.)  The psychologist reminded Plaintiff that her placement in the SHU "was a result of the report of PREA and safety concerns which needed to be investigated." (*Id.* ¶ 68.)  The psychologist noted that Plaintiff's current suicide risk was "moderate" and "present."  (*Id.* ¶ 70.)  A formal suicide watch was initiated "via the use of inmate suicide watch companions."  (*Id.* ¶ 72.)  While on suicide watch, a psychologist evaluated Plaintiff daily.  (*Id.* ¶ 74.)  Plaintiff, like other inmates on suicide watch, was not permitted to receive a razor to shave.  (*Id.* ¶ 75.)

On May 14, 2016, Plaintiff refused to come to the door of her cell to talk to a psychologist.  (*Id.* ¶ 76.)  It was noted that she was uncooperative, was being watched

by an inmate companion, and that she should stay on suicide watch. (*Id.* ¶¶ 76-77.) On May 15, 2016, a psychologist noted that Plaintiff's "affect was normal and mood was euthymic." (*Id.* ¶ 78.) Plaintiff "reported working closely with a primary psychologist and was upset following placement in SHU due to the fact that emotions oscillate as a result of hormone therapy." (*Id.* ¶ 81.) She had not wanted to talk to the psychologist the day before because she "was cold and wanted to stay under the blanket." (*Id.* ¶ 82.) Plaintiff explained that at the time of her initial assessment, she was "very upset" about being placed in the SHU. (*Id.* ¶ 83.) The psychologist concluded that "there was no reason to continue suicide watch placement."[12] (*Id.* ¶ 84.)

On May 17, 2016, Plaintiff expressed "annoyance" at being in the SHU. (*Id.* ¶ 87.) She "emphasized hating being in isolation again and being on an 'emotional roller coaster.'" (*Id.* ¶ 88.) Plaintiff asked about the possibility of having her

---

[12] The Government maintains that during the May 15, 2016 evaluation, Plaintiff "denied suicidal and/or homicidal ideation intent" and that there "were no clinical indications that [Plaintiff] was in danger of self-harm at the time." (Doc. No. 28 ¶¶ 79-80.) The psychologist decided to remove Plaintiff from suicide watch because of her "presentation, willingness to engage in the assessment process, level of cooperativeness and future orientation, and talking and joking with the inmate companion." (*Id.* ¶ 84.) The psychologist noted that Plaintiff's "mental health status was within normal limits, that [Plaintiff] had a safety plan in place and would follow it if there were any thoughts of self-harm." (*Id.* ¶ 86.) Plaintiff disputes this, noting that she "reported suicidal thoughts, feelings, and intent every single day she was in SHU." (Doc. No. 32 at 1.)

medication increased. (*Id.* ¶ 89.) The psychologist and Plaintiff "reviewed impulsivity and skills used to refrain from urges to cut."[13] (*Id.* ¶ 90.)

The next day, Plaintiff reported that she had experienced urges to cut herself the night before and surrendered a razor to staff. (*Id.* ¶ 92.) She "reported being stressed and having mood swings." (*Id.* ¶ 93.) The psychologist screened Plaintiff "for a variety of empirically validated factors commonly associated with risk for self-harm and suicide." (*Id.* ¶ 94.) It was noted that Plaintiff's thoughts of cutting had not returned. (*Id.* ¶ 95.) Plaintiff "was praised for alerting staff before acting on the impulses" to cut. (*Id.* ¶ 98.) She "displayed future orientation during the interview by asking for missing items from property and talking about the following week's session." (*Id.* ¶ 99.) The psychologist determined that suicide watch was not warranted.[14] (*Id.* ¶ 100.)

---

[13] The Government states that during this session, Plaintiff "denied suicidal/homicidal or self-injurious behavior ideation, intention or plan." (Doc. No. 28 ¶ 91.) Plaintiff disputes this. (Doc. No. 32 at 1.)

[14] The Government maintains that prior records indicate that Plaintiff's behavior "was driven by attempts to control the conditions of confinement," and that Plaintiff admitted to this "but at times has used self-harm as a means of releasing frustration." (Doc. No. 28 ¶¶ 96-97.) The Government asserts that Plaintiff was "considered to be a low risk of suicide" and that her "focus and concern for property items suggested to the psychologist that [she] was not suicidal but rather was using the threat of self-harm to manipulate psychology services to obtain what was wanted." (*Id.* ¶¶ 100-101.) Plaintiff disputes this, noting that she "reported suicidal thoughts, feelings, and intent every single day she was in SHU" and "never requested or complained about anything in relation to her expression of suicidal ideation or self-harm." (Doc. No. 32 at 1-2.)

On May 19, 2016, the SHU lieutenant reported to psychology that Plaintiff was potentially suicidal. (*Id.* ¶ 102.) Upon evaluation, psychology noted that Plaintiff was irritated "for being told by the Warden that [she] was manipulating staff."[15] (*Id.* ¶ 104.) The psychologist determined that suicide watch was not warranted. (*Id.* ¶ 108.)

On May 24, 2016, Plaintiff "requested an increase in medication and that Ativan be prescribed." (*Id.* ¶ 113.) She also discussed "the Transgender Law Center working to identify transgender conforming prison housing." (*Id.* ¶ 114.) Plaintiff's "thought process was logical, coherent, and goal oriented."[16] (*Id.* ¶ 115.)

---

[15] The Government maintains that Plaintiff was "irritable and stressed over the pending investigation and that Care 3 incentives went missing." (Doc. No. 28 ¶ 103.) She was "feeling dramatic and pissed and said extreme measures would be taken, if necessary, if SIS took weeks to complete its investigation." (*Id.* ¶ 105.) Plaintiff "asked about Care 3 'incentive items' (hygiene items, snacks, puzzles, self-help books, cards, radio, batteries, etc.) to replace missing ones." (*Id.* ¶ 106.) The Government asserts that she "denied any present suicidal thoughts and the need to go on suicide watch." (*Id.* ¶ 107.) The psychologist perceived the interaction to be another attempt to manipulate staff and that Plaintiff "was using this manipulation in order to see psychology more than once a week." (*Id.* ¶¶ 109-110.) The psychologist believed that Plaintiff's "focus on the Care level 3 incentive items suggested [Plaintiff] was not truly suicidal or at risk for self-harm but rather was using the threat to obtain secondary gain including increased contacts with psychology and a return of Care Level 3 incentive items." (*Id.* ¶ 111.) Plaintiff disputes this, noting that she "reported suicidal thoughts, feelings, and intent every single day she was in SHU" and "never requested or complained about anything in relation to her expression of suicidal ideation or self-harm." (Doc. No. 32 at 1-2.)

[16] The Government maintains that during this session, Plaintiff "denied suicidal/homicidal/self-injurious behavior ideation, intention or plan." (Doc. No. 28 ¶ 116.) The psychologist believed that Plaintiff was again attempting to manipulate her conditions of confinement "to obtain an increased dosage in a prescription and to obtain additional medication/Ativan." (*Id.* ¶ 117.) The psychologist also believed that Plaintiff's discussion of the Transgender Law Center suggested she was not a suicide risk or posed a risk of self-harm. (*Id.* ¶ 118.) Plaintiff disputes this, noting that she "reported suicidal thoughts, feelings, and intent every single day she was in SHU" and "never

On May 25, 2016, a lieutenant conducting rounds in the SHU found Plaintiff cutting her left arm with a razor. (*Id.* ¶ 138.) Plaintiff flushed the razor and complied with orders to submit to hand restraints. (*Id.* ¶ 139.) She was "removed from the cell, pat searched, metal detected, photographed, and escorted to Health Services for treatment." (*Id.* ¶ 140.) Plaintiff sustained "multiple lacerations to the left arm, left leg, front and back of the head, scrotum, and tongue." (*Id.* ¶ 141.) She "reported that morning encounters with various staff resulted in feelings of anger, rejection, and helplessness." (*Id.* ¶ 120.) It was reported that Plaintiff had swallowed 60 pills and pieces of plastic and had placed a paper clip and razor blades in her scrotum. (*Id.* ¶ 121.) Plaintiff was taken to an outside hospital for treatment. (*Id.* ¶¶ 122, 142.) Psychology services was notified and directed that Plaintiff be placed on formal suicide watch upon her return from the hospital. (*Id.* ¶¶ 119, 123, 143.) Plaintiff returned to USP Allenwood that evening. (*Id.* ¶ 124.) She was removed

---

requested or complained about anything in relation to her expression of suicidal ideation or self-harm." (Doc. No. 32 at 1-2.)

from suicide watch on May 27, 2019.[17]  (*Id.* ¶ 127.)  A psychologist saw Plaintiff on May 31, 2016 and June 2, 2016.[18]  (*Id.* ¶¶ 129-130.)

Plaintiff was not on suicide watch on June 5, 2016.  (*Id.* ¶ 132.)  That evening, staff observed Plaintiff "standing in front of the cell door window with a small laceration on the left arm and a small amount of blood on [her] boxers." (*Id.* ¶ 145.) An officer then observed Plaintiff "swallow a piece of pencil approximately one inch long." (*Id.* ¶ 146.)  Plaintiff reported that she had ingested "approximately 100 unknown blue pills" and three pencils. (*Id.* ¶ 146.)  She also reported "cutting open the scrotum and inserting metal springs and other foreign objects inside."[19]  (*Id.* ¶ 147.)

---

[17] The Government maintains that Plaintiff was removed from suicide watch because of her "improved mental status." (Doc. No. 28 ¶ 127.)  Plaintiff had "an improved mood, decreased hopelessness, and a credible denial of current suicide and self-harm thought/plan/intent." (*Id.* ¶ 127.)  Plaintiff disputes this, stating that she "reported suicidal thoughts, feelings, and intent every single day she was in SHU." (Doc. No. 32 at 1.)

[18] The Government maintains that during the May 31, 2016 session, the psychologist noted that Plaintiff's "thought processes were logical, coherent and goal oriented, and that [she] denied suicidal/homicidal or self-injurious behavior." (Doc. No. 28 ¶ 129.)  During the June 2, 2016 session, Plaintiff "made no threats or statements of self-harm." (*Id.* ¶ 130.)  Plaintiff disputes this, stating that she "reported suicidal thoughts, feelings, and intent every single day she was in SHU." (Doc. No. 32 at 1.)

[19] Plaintiff asserts that, at some unknown time while she was in the SHU, an officer gave her a razor blade and did not retrieve it, despite having an obligation to do so. (Doc. No. 1 ¶ 2.)  She maintains that on June 5, 2016, prior to cutting herself and ingesting the objects, she told the officer on duty that she was suicidal and displayed a razor blade. (*Id.* ¶ 5.)  She alleges that the officer "failed to retrieve the razor or to contact a psychologist." (*Id.* ¶ 6.)  She asserts that she used the razor blade "to attempt to remove her testicles and scrotum." (*Id.* ¶ 7; Doc. No. 32 at 2.)  The Government maintains that "hospital records indicate [Plaintiff] reported that a pencil was used to

Plaintiff complied with orders to submit to hand restraints. (*Id.* ¶ 148.) She "was removed from the cell, pat searched, metal detected, photographed and escorted to Health Services for treatment." (*Id.* ¶ 149.) Health services staff removed a metal spring from her scrotum.[20] (*Id.* ¶ 150.) The officer who first observed Plaintiff and witnessed her swallowing a pencil wrote an incident report, and the lieutenant on duty wrote a memorandum.[21] (*Id.* ¶¶ 154, 156.) Psychology staff members were notified, and they decided to place Plaintiff on a formal suicide watch upon her return to USP Allenwood. (*Id.* ¶ 152.) Psychology services is the department responsible for authorizing that an inmate be placed on suicide watch. (*Id.* ¶ 153.) Plaintiff received treatment at Geisinger Medical Center, where she "underwent a procedure to remove a metal wire or paper clip from the scrotum and another procedure to remove the pencils which had been ingested." (*Id.* ¶¶ 162-63.)

---

cut open the scrotum." (Doc. No. 28 ¶ 164.) In her declaration, however, Plaintiff maintains that "[t]he transport officer claimed this in his statements to the treating doctors and [she] was instructed by the officers who were armed with loaded firearms to 'keep [her] mouth shut.'" (Doc. No. 32 at 3.)

[20] Plaintiff maintains that the nurse who removed the spring "used a pair of clean pli[e]rs" to do so and "lack[ed] the education and license to perform a surgical act." (Doc. No. 1 ¶ 9.)

[21] The Government maintains that if a razor blade had been involved, both the officer and the lieutenant would have noted this in their respective reports. (Doc. No. 28 ¶¶ 155, 157.) Moreover, the Government asserts that the Form 583, Report of Incident, submitted by the Warden, indicated that no weapon was involved. (*Id.* ¶¶ 158-159.)

On June 7, 2016, Plaintiff was on suicide watch and was seen by a psychologist. (*Id.* ¶ 136.) The psychologist determined that Plaintiff should remain on suicide watch. (*Id.* ¶ 137.)

On June 27, 2016, Plaintiff filed an administrative tort claim in which she alleged to be mentally ill and suffering from gender dysphoria but had been negligently allowed to keep a razor "which was then used in an attempt at suicide and to remove testicles on June 5, 2016." (*Id.* ¶ 165.) Plaintiff requested $1,000,000.00 in damages, alleging that she suffered nerve damage, scarring, pain, suffering, and mental and emotional trauma. (*Id.* ¶ 166.) On December 27, 2017, the BOP's Northeast Regional Office denied Plaintiff's claim "after a review of the medical records indicated that [Plaintiff] had not suffered a compensable loss as a result of any negligence by BOP staff." (*Id.* ¶ 167.) Plaintiff requested reconsideration. (*Id.* ¶ 168.) Reconsideration was denied on October 12, 2018 "due to lacking sufficient evidence to support the allegations and because the medical records d[id] not reflect that [Plaintiff] suffered a compensable loss as a result of the negligence of BOP staff." (*Id.* ¶ 168.) Plaintiff "did not file an administrative tort claim that a BOP nurse was not adequately trained or skilled to remove the items from [her] scrotum on June 5, 2016." (*Id.* ¶ 169.)

## IV. DISCUSSION

The United States asserts that it is entitled to summary judgment because: (1) Plaintiff failed to exhaust his claim regarding the nurse; (2) Plaintiff has not stated a *prima facie* case of negligence; and (3) Plaintiff cannot establish causation. (Doc. No. 29 at 15-33.) The Court considers each argument in turn.

### A. Failure to Exhaust

"The FTCA allows federal prisoners to pursue lawsuits against the United States in an effort to recover for personal injuries sustained during confinement by reason of [the] negligence of government employees." *Chavez Rodriguez v. United States Bureau of Prisons*, No. 3:16-cv-2531, 2019 WL 1140230, at *11 (M.D. Pa. Mar. 12, 2019). However, as a prerequisite to suit under the FTCA, a claim must first be presented to and denied by the appropriate federal agency. The FTCA provides that:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a). A claim "is considered to be presented when the federal agency receives written notification of the alleged tortious incident and the alleged injuries,

together with a claim for money damages in a sum certain." *Davenport v. United States*, No. 1:13-CV-1334, 2014 WL 2115209, at *5 (M.D. Pa. May 21, 2014) (citing 28 C.F.R. § 14.2(a)). The requisite written notice is "minimal," and a claimant is required to provide "only enough information to allow the agency to 'begin its own investigation' of the alleged events and explore the possibility of settlement." *Burchfield v. United States*, 168 F.3d 1252, 1255 (11th Cir. 1999) (quoting *Adams v. United States*, 615 F.2d 284, 289 (5th Cir. 1980)). While the claimant must apprise the government of its potential liability, *see Bush v. United States*, 703 F.2d 491, 494 (11th Cir. 1983), the claimant is "not require[d] . . . to provide the agency with a preview of his or her lawsuit by reciting every possible theory of recovery or every factual detail that might be relevant," *Burchfield*, 168 F.3d at 1255.

The Third Circuit has instructed that "[i]n light of the clear, mandatory language of the statute, and [the] strict construction of the limited waiver of sovereign immunity by the United States, . . . the requirement that the appropriate federal agency act on a claim before suit can be brought is jurisdictional and cannot be waived." *Roma v. United States*, 344 F.3d 352, 362 (3d Cir. 2003). Likewise, the Supreme Court has noted that "[t]he FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." *McNeil v. United States*, 508 U.S. 106, 113 (1993). As a result, courts lack subject matter

jurisdiction over claims brought pursuant to the FTCA when plaintiff have not exhausted their administrative remedies with respect to such claims prior to filing suit. *See Abulkhair v. Bush*, 413 F. App'x 502, 506 (3d Cir. 2011); *Accolla v. United States Gov't*, 369 F. App'x 408, 409-10 (3d Cir. 2010).

Here, the Government argues that "the summary judgment evidence reveals that [Plaintiff] has not filed any administrative tort claims regarding the allegation that a BOP nurse was not adequately trained or skilled to remove the items from [her] scrotum on June 5, 2016." (Doc. No. 28 at 21.) In support of its argument, the United States has provided a declaration from Michael Romano, an Attorney Advisor for the BOP, as well as copies of Plaintiff's administrative tort claim regarding the June 5, 2016 incident. (Doc. No. 28-1 at 174-75, 185-194.) In response, Plaintiff contends that the level of detail in his administrative tort claim was "adequate" and that staff members "had every chance to interview [her] as part of its tort claim 'investigation' but chose to deny the claim without ever speaking to [her]." (Doc. No. 33 at 2.) According to Plaintiff, the Government "should not now be permitted to nitpick at the level of information the agency itself put together to decide the claim." (*Id.*)

In his administrative tort claim, Plaintiff alleged that he was mentally ill and suffered from gender dysphoria yet was "negligently allowed to keep a razor by USP

Allenwood SHU staff which she used to attempt to kill herself and remove her testicles." (Doc. No. 28-1 at 185.) Upon review of the record, the Court concludes that Plaintiff's administrative tort claim failed to put the BOP on notice to investigate any alleged negligence by the nurse who removed the spring from Plaintiff's scrotum. *See Staggs v. United States*, 425 F.3d 881, 884 (10th Cir. 2005) (noting that an administrative claim requires "a written statement sufficiently describing the injury to enable the agency to begin its own investigation"). Rather, Plaintiff's theory of recovery focused on the alleged negligence by SHU staff in permitting him to possess a razor blade despite his mental health. Thus, the Court concludes that Plaintiff's administrative tort claim was not sufficient to exhaust his administrative remedies with respect to his claim that the nurse who removed the spring from his scrotum acted negligently and was not adequately trained or skilled to provide the treatment rendered. *See Thrower v. United States*, No. 1:11-CV-1663, 2012 WL 3679702, at *7 (M.D. Pa. Aug. 24, 2012) (concluding that plaintiff had not exhausted any claims of medical negligence brought pursuant to the FTCA because he had not raised the issue of such negligence to any appropriate federal agency). Accordingly, the Court will grant summary judgment to the Government because it lacks jurisdiction over Plaintiff's claim regarding the nurse's actions. *See Abulkhair*, 413 F. App'x at 506; *Accolla*, 369 F. App'x at 409-10.

## B. Plaintiff's Negligence Claims Regarding SHU Staff

Plaintiff also raises negligence claims regarding actions taken by officers assigned to the SHU during Plaintiff's incarceration there. The Court interprets Plaintiff's complaint to assert two (2) instances of negligence by SHU staff: (1) when an officer gave her a razor blade and did not retrieve it; and (2) when the officer on duty on June 5, 2016 failed to retrieve the razor and contact a psychologist after Plaintiff displayed the razor and stated that she was suicidal. (Doc. No. 1 ¶¶ 2-6.)

The FTCA "provides a mechanism for bringing a state law tort action against the federal government in federal court" and the "extent of the United States' liability under the FTCA is generally determined by reference to state law." *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 264 F.3d 344, 362 (3d Cir. 2001) (quoting *Molzof v. United States*, 502 U.S. 301, 305 (1992)). Where a federal court is presented with a claim brought under the FTCA, it applies the law of the state in which the alleged tortious conduct occurred. *See* 28 U.S.C. § 1346(b). In this case, the allegedly tortious conduct occurred in Pennsylvania, and thus the Court refers to Pennsylvania tort law to assess the extent of the United States' potential liability on Plaintiff's remaining claim.

Under Pennsylvania law, in order to "establish a cause of action for negligence, the plaintiff must prove the following elements: (1) a duty or

obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." *Northwest Mutual Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005) (citing *Pittsburgh Nat'l Bank v. Perr*, 637 A.2d 334, 336 (Pa. Super. Ct. 1994)). In accordance with this standard, a plaintiff bears the burden of proving by a preponderance of the evidence that the defendant's negligence was the proximate cause of his injury. *Skipworth v. Lead Indus. Ass'n*, 690 A.2d 169, 172 (Pa. 1997). Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury alleged. *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978).

Factors that Pennsylvania courts consider in determining whether a defendant's conduct is a substantial factor in bringing about harm to another are: "(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the point of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (c) lapse of time." *Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1287 (Pa. Super. Ct. 2005). As another court has explained:

> A determination of legal causation, essentially regards "whether the negligence, if any, was so remote that as a matter of law, [the actor]

cannot be held legally responsible for [the] harm which subsequently, occurred." *Novak [v. Jeannette Dist. Mem. Hosp.*, 410 Pa. Super. 603, 600 A.2d 616, 618 (Pa. Super. Ct. 1991) (citation omitted)]. Therefore, the court must determine whether the injury would have been foreseen by an ordinary person as the natural and probable outcome of the act complained of. *Merritt v. City of Chester*, 344 Pa. Super. 505, 508, 496 A.2d 1220, 1221 (1985).

*Reilly v. Tiergarten Inc.*, 633 A.2d 208, 210 (Pa. Super. Ct. 1993).

### 1.    Provision of the Razor

Plaintiff first suggests that an unknown officer was negligent when that officer provided Plaintiff with a razor blade and failed to retrieve the razor despite an obligation to do so. (Doc. No. 1 ¶¶ 2-3.) For the reasons set forth below, the Court concludes that Plaintiff has not established a breach of the Government's duty.

The undisputed facts establish that on May 25, 2016, a lieutenant conducting rounds in the SHU found Plaintiff cutting her left arm with a razor. (Doc. No. 28 ¶ 138.) Plaintiff was ultimately taken to an outside hospital for treatment and placed on suicide watch upon her return from the hospital. (*Id.* ¶¶ 119, 122-23, 142-43.) While on suicide watch, Plaintiff was not permitted to shave and receive a razor. (*Id.* ¶ 75.) She was removed from suicide watch on May 27, 2019. (*Id.* ¶ 127.) Plaintiff was not on suicide watch on June 5, 2016, the date of the events alleged in her complaint. (*Id.* ¶ 132.)

Nothing in the record before the Court establishes when Plaintiff received this razor. Regardless, Plaintiff has failed to state a negligence claim against the Government for providing her with a razor. The undisputed facts, as set forth above, reveal that Plaintiff was not on suicide watch between May 27 and June 5, 2016. Moreover, the undisputed facts reveal that on previous occasions, Plaintiff was permitted to be in possession of a razor when not on suicide watch. (*See* Doc. No. 28 ¶¶ 92, 138.) Therefore, "there was no reason to preclude [her] from having a razor to shave and consequently, no breach of the [Government's] duty." *Pinson v. United States*, No. 1:17-cv-584, 2018 WL 1123713, at *16 (M.D. Pa. Feb. 26, 2018) (granting summary judgment to the United States on a similar claim). Thus, the Court will grant summary judgment to the United States with respect to Plaintiff's claim concerning provision of the razor.

> **2.    Officer's Failure to Retrieve Razor and Notify Psychology After Plaintiff Stated She Was Suicidal**

Plaintiff also contends that negligence occurred when, on June 5, 2016, she displayed a razor to a SHU officer, stated that she was suicidal, and the officer failed to retrieve the razor or contact a psychologist. (Doc. No. 1 ¶¶ 5-6.) Plaintiff maintains that after doing so, she used the razor "to attempt to remove her testicles and scrotum." (*Id.* ¶ 7.)

The Government asserts that summary judgment is warranted because Plaintiff has failed to state a *prima facie* case of negligence by the United States and because Plaintiff cannot establish causation. (Doc. No. 29 at 22-33.) The Government maintains that there is no evidence that Plaintiff used a razor blade to engage in self-mutilation and that, by Plaintiff's own admission, it was a pencil, not a razor blade, that was used. (*Id.* at 27.) The Government further argues that Plaintiff has not established causation because: (1) the self-inflicted harm was not caused by a razor; (2) Plaintiff stole the razor; (3) Plaintiff failed to report suicidal tendencies prior to the incident; and (4) it was Plaintiff's "own decision which precipitated the infliction of self harm." (*Id.* at 30.) In support of its arguments, the Government has submitted a declaration from T. Rung, the officer on duty in the SHU who observed Plaintiff swallow pieces of pencil, copies of the incident reports, a declaration and memorandum from S. Valencik, the lieutenant on duty on June 5, 2016, a declaration from B. Buschman, a physician at USP Allenwood, and copies of Plaintiff's relevant medical records. (Doc. No. 28-1 at 203-44.)

As noted *supra*, Plaintiff's verified complaint serves as an affidavit in opposition to the motion for summary judgment. *See Ziegler v. Eby*, 77 F. App'x 117, 120 (3d Cir. 2003). Plaintiff has also submitted a declaration, in which she again states that she used a razor to open her scrotum, and that the razor was given

to her by Officer Rung. (Doc. No. 32 at 3.) She also denies reporting to hospital staff that she used a pencil to "slice open [her] scrotum." (*Id.*) Plaintiff avers that while at the hospital after the incident of June 5, 2016, "[t]he transport officer claimed this in his statements to the treating doctors and [she] was instructed by the officers who were armed with loaded firearms to 'keep [her] mouth shut.'" (*Id.*) Plaintiff maintains that she "submitted a request to the BOP to obtain a declaration from Timothy Beckwith, [her] cellmate at USP Allenwood during the relevant time period as Beckwith is willing to corroborate [her] claims." (*Id.*) The request, however, was denied. (*Id.*)

Given the discrepancies in the parties' view of events, it is the Court's view that there exist genuine issues of material fact regarding whether the United States was negligent on June 5, 2016. Such issues of fact will likely turn on a credibility assessment, which the Court may not undertake at this stage. *See Anderson*, 477 U.S. at 252. Moreover, the fact that the Government has presented more evidence in its favor than does Plaintiff is not dispositive. *See Powell v. United States*, No. 4:14CV02584, 2016 WL 1177856, at *4 (N.D. Ohio Mar. 28, 2016) (noting that "quantity of evidence does not decide a motion for summary judgment"). Viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that the United States was negligent when, on June 5, 2016, the officer on duty failed

to retrieve a razor from Plaintiff and contact a psychologist despite Plaintiff's statement that she was suicidal. *See, e.g.*, *Estate of Riopedre v. United States*, No. 8:12-2806-BHH, 2015 WL 505584, at *13 (D.S.C. Feb. 6, 2015) (denying summary judgment with respect to FTCA claim that United States was negligent, concluding that there was a genuine issue of material fact "as to whether Riopedre was a suicide risk, whether Defendants should have been on notice of [his] deteriorating mental health, and whether prison officials should have done more to lower his risk of suicide"); *D'Antuono v. United States*, No. 4:07-CV-123-Y, 2010 WL 2464493, at *6-7 (N.D. Tex. June 15, 2010) (concluding that United States was liable to estate of deceased inmate because officers breached their duty by, *inter alia*, failing to notify medical staff when inmate threatened suicide). Accordingly, the Court will deny summary judgment with respect to this claim.

## V.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the United States' motion for summary judgment. (Doc. No. 22.) An appropriate Order follows.

S/SYLVIA H. RAMBO
United States District Judge

Dated: August 29, 2019